IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 19-cv-00755-DDD

BRANDON D. CAMPBELL,

     Applicant,

v.

MATTHEW HANSEN, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

     Respondents.

---

## ORDER DENYING APPLICATION
## FOR A WRIT OF HABEAS CORPUS

---

The matter before the court is an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, filed *pro* se, by Brandon D. Campbell. (Doc. 1). Having considered the Application, Respondents' Answer (Doc. 23), Mr. Campbell's Reply (Doc. 24), and the state court record, the Court finds and concludes that the Application should be denied and the case dismissed with prejudice.

### Background

In January 2014, Mr. Campbell was convicted by a jury in Jefferson County District Court Case No. 12CR1091 of second-degree burglary, theft, and criminal mischief. (Doc. 1 at 3). He was adjudicated a habitual offender and sentenced to serve an aggregate 48-year prison term. (Doc. 10-2 at 9-10). (State Court Record ("R."), Court File at 196).[1] The Colorado Court of Appeals summarized Mr. Campbell's case as follows:

---

[1]  For ease of reference, the court's citation to page numbers in the state court file is to the page numbers as reflected on the pdf.doc contained in the CD Rom submitted by the Jefferson County District Court (Doc. 19).

> In late April 2012, the victim, J.P., called 911 to report an intruder in his home. He provided the 911 dispatcher with a description of the intruder and stated that he believed the suspect had driven away in a white Ford Explorer.
>
> Officers stopped a white Ford Explorer about ten minutes later approximately three miles from the victim's home. Campbell was the driver and only occupant of the vehicle. Officers searched Campbell and found he was wearing an ankle monitor. A detective later requested and received the [GPS] data from the company owning the ankle monitor. The GPS data revealed that, within the month before J.P.'s home was broken into, Campbell had been at the location of two other homes when they were burglarized. The GPS data also placed Campbell at J.P.'s house at the time of the break-in. Campbell was convicted of two counts of second degree burglary, one count of attempted second degree burglary, and three counts of criminal mischief.

*People v. Campbell*, 425 P.3d 1163, 1166 (Colo. App. 2018).

The Colorado Court of Appeals affirmed the convictions on January 25, 2018. *See id.* Mr. Campbell's petition for certiorari review was denied by the Colorado Supreme Court on September 10, 2018. *See Campbell v. People*, 2018 WL 4308700 (Sept. 10, 2018). (Doc. 10-1).

On March 13, 2019, Mr. Campbell filed a § 2254 application for a writ of habeas corpus asserting two bases for relief: (1) the police violated his Fourth Amendment rights when they "seized" location data obtained from his ankle monitor without a warrant (Doc. 1 at 4-12); and, (2) his Fourteenth Amendment right to due process was violated when police used an unduly suggestive pre-trial police identification procedure (*id.* at 12-16).[2]

---

[2]   Because Mr. Campell is representing himself in this matter, the court construes his pleadings liberally. *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

In a pre-answer response, Respondents conceded that the Application is timely under the one-year limitation period set forth in 28 U.S.C. § 2244(d)(1) and that Mr. Campbell exhausted available state-court remedies. (Doc. 10 at 4-7). Respondents argued, however, that claim one, asserting a Fourth Amendment violation, is barred by the rule announced in *Stone v. Powell* that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 482 (1976). During preliminary review pursuant to Local Civ. R. 8.1(b), Magistrate Judge Gordon P. Gallagher determined, in an April 11, 2019, Order (Doc. 11), that Mr. Campbell's Fourth Amendment claim required further review. *See, e.g, Thornton v. Goodrich*, 645 F. App'x 666, 666–67 (10th Cir. April 13, 2016) (reversing and remanding dismissal of § 2254 application asserting Fourth Amendment violation because district court failed to fully evaluate the petitioner's argument that the rule of *Stone* did not bar his claim). This action was then reassigned to the undersigned and the parties briefed the merits of the claims.

## Analysis

### I. Applicable Legal Standards

#### A. 28 U.S.C. § 2254

To be entitled to relief under Section 2254(d)(1), an applicant must prove that his application implicates a clearly established rule of law and that the state court applied that rule unreasonably. First, clearly established "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The holdings

must come from cases where "where the facts are at least closely-related or similar" and the Supreme Court has "expressly extended the legal rule to that context." *House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008). If there is no clearly established law, the court's inquiry ends. *See id*. at 1018. Second, a state court unreasonably applies clearly established law "when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts" including an unreasonable extension or refusal to extend. *House* 527 F.3d at 1018.

Section 2254(d)(2) requires that the plaintiff prove most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Harrington*, 562 U.S. at 88 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"). The applicant bears the burden of proof to prove his entitlement to the writ under Section 2254. *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

The court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question is whether the applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time of the last state court decision on the merits. *See Greene v. Fisher*, 565 U.S. 34 (2011). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). The court "must defer to the state court's factual deter-

minations so long as 'reasonable minds reviewing the record might disagree about the finding in question.'" *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (quoting *Brumfield v. Cain*, 135 S.Ct. 2269, 2277 (2015)). "If the petitioner can show that 'the state courts plainly misapprehend[ed] or misstate[d] the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.'" *Id.* (alterations in original) (internal quotation marks and citation omitted).

Under Section 2254(e)(1), the court presumes the correctness of the state court's factual determinations and the applicant bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller- El v. Cockrell*, 537 U.S. 322, 340 (2003)).

## II.   Claim One: Fourth Amendment

Mr. Campbell asserts that his Fourth Amendment rights were violated when the police "seized" location data obtained from his ankle monitor without a warrant and the State used the data against him at trial. (Doc. 1 at 4-12).

### A. State court proceedings

Before trial, the defense filed a motion to suppress the GPS data generated by Mr. Campbell's ankle monitor. (R., Court File, at 53-57). The trial court held an evidentiary hearing. A detective testified that Mr. Campbell was wearing an ankle monitor at the time of his arrest. (R., 1/6/14 Hrg. Tr. at 49). Mr. Campbell told police that his bondsman had put the ankle monitor on him. (*Id.*). The detective did not seize the ankle

monitor, but instead contacted the business that collected the location data transmitted by the ankle monitor to determine whether he could obtain the data. (*Id.* at 67-69). The company told him to send a request, which he did. (*Id.* at 69-71). The detective did not seek a warrant to obtain the information because the business agreed to provide it voluntarily. (*Id.* at 69-71).

The state district court denied Mr. Campbell's motion to suppress the GPS data on the grounds that he lacked standing to bring the claim and did not have a reasonable expectation of privacy in the GPS data:

> The Court finds that these are records from the GPS company that was monitoring Mr. Campbell as a condition of his bond, whether required by the bondsman or the Court.
>
> I might rule differently if we were dealing with the device itself, but we're not. We're dealing with information garnered from the device and whether Mr. Campbell has standing to challenge the giving of the data to the police without a warrant.
>
> ….
>
> The Court finds that Mr. Campbell does not have standing to challenge those particular records. And I'm relying on the *People v. Galvadon* case, 103 P.3d 923. Mr. Campbell is not asserting his own rights. These are records that a third-party holds for the bondsman and the bondsman might have some expectation of privacy with respect to those, but certainly Mr. Campbell would not.

(R., 1/7/14 Hrg. Tr. at 32-33).

After Mr. Campbell was convicted, he appealed the trial court's order denying his motion to suppress. The Colorado Court of Appeals affirmed, holding that Mr. Campbell did not have a reasonable expectation of privacy in the GPS data disclosed to his bondsman under the second prong of *Katz v. United States*, 389 U.S. 347 (1967), *Campbell*, 425 P.3d at 1169-70.

> [T]he cases cited by Campbell do not address the precise issue here—whether a defendant has a reasonable expectation of privacy in GPS location data transmitted to and collected by a third party. Under the Supreme Court precedent, Campbell had no reasonable expectation of privacy in the GPS data because he voluntarily disclosed such data to a third party—his bondsman. Campbell was aware that his bondsman had access to the GPS location data to ensure that he did not leave the state while out on bond. In short, Campbell "t[ook] the risk, in revealing his affairs to another, that the information w[ould] be conveyed by that person to the Government." *Miller*, 425 U.S. at 443, 96 S.Ct. 1619. Thus, even if we assume he subjectively believed his GPS data would remain private, that expectation was not one society would be prepared to call reasonable.
>
> . . .
>
> Accordingly, we conclude that Campbell cannot invoke the protections of . . . the Fourth Amendment of the United States Constitution . . . because he had no reasonable expectation of privacy in the GPS data. Thus, the trial court did not err in denying his motion to suppress.

*Campbell*, 425 P.3d at 1169-70.

Mr. Campbell filed a petition for writ of certiorari in the Colorado Supreme Court seeking discretionary review of the Colorado Court of Appeals' determination of his Fourth Amendment claim. On June 22, 2018, while Mr. Campbell's petition was pending, the United States Supreme Court decided *Carpenter v. United States*, 138 S .Ct. 2206 (2018). In *Carpenter*, the Court held that the government's acquisition of cell-cite location information held by a third party is a search entitled to Fourth Amendment protections. *Id.* at 2217. Mr. Campbell filed a notice of supplemental authority with the Colorado Supreme Court and asked the Court to consider *Carpenter* in ruling on the certiorari petition. The Colorado Supreme Court denied the petition for certiorari. *See Campbell*, 2018 WL 4308700. Two Justices stated that they would have granted certiorari review on the following issue:

> Whether the district court erroneously denied the peti-
> tioner's motion to suppress evidence of global positioning
> satellite (GPS) data, in violation of the petitioner's state
> and federal constitutional right against unreasonable
> search and seizure.

*Id.*

## B. Applicable Supreme Court law

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures, *see* U.S. Const. amend. IV, and may be enforced through the exclusionary rule, *see, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 254 (1983).

The Supreme Court held in *Katz* that the government's activities in electronically listening to and recording Mr. Katz's telephone call in a public telephone booth violated the privacy upon which he justifiably relied while using the booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment. *Id.* at 353. The Court recognized that "the Fourth Amendment protects people, not places," and that what an individual "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351. *See also id.* at 360 (recognizing that the Fourth Amendment protects an area in which an individual has a "reasonable expectation of privacy" from unjustified governmental intrusion). (Harlan, J., concurring).

In *United States v. Miller*, 425 U.S. 435 (1976), the Supreme Court addressed whether an individual has a protected Fourth Amendment interest in records disclosed to a third party. Federal agents investigating a tax fraud subpoenaed Mitchell Miller's bank account records. 425 U.S. at 437. The Supreme Court held that Miller had no protected Fourth Amendment interest in the account records because the documents were: (1) business records of transactions to which the banks were parties; and (2) Miller voluntarily conveyed the information to the banks

during the ordinary course of business. *Id*. at 442-43. The Court explained "that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id*. at 443.

Three years later, the Supreme Court held in *Smith v. Maryland* that the government's installation and use of a pen register—a device that recorded the outgoing phone numbers dialed on a landline telephone— did not violate the Fourth Amendment because even if Mr. Smith had a subjective expectation that phone numbers he dialed would remain private, his expectation was not "one that society is prepared to recognize as reasonable." 442 U.S. 735, 743-44 (1979) (citing *Katz*, 389 U.S. at 361). The *Smith* Court reaffirmed that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties. *Id*. at 743-44 (citing *Miller*, 425 U.S. at 443). The Court stated:

> When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed.

*Smith*, 442 U.S. at 744.

The Supreme Court next took up location-revealing trackers in *United States v. Knotts*, 460 U.S. 276 (1983). There, police officers planted a beeper in a container of chloroform before it was purchased by one of Knotts's co-conspirators. The officers followed the automobile carrying the container from Minneapolis to Knotts's cabin in Wisconsin, relying on the beeper's signal to help keep the vehicle in view. The Supreme Court determined that the "augment[ed]" visual surveillance did not constitute a search because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his

movements from one place to another." *Id*., at 281, 282. The Court reasoned that since the movements of the vehicle and its destination had been "voluntarily conveyed to anyone who wanted to look," Knotts could not assert a privacy interest in the information obtained. *Id*. at 281. The Supreme Court emphasized the "limited use which the government made of the signals from this particular beeper" during a discrete "automotive journey, " *id*. at 284-85, and recognized that "different constitutional principles may be applicable" if "twenty-four hour surveillance of any citizen of this country [were] possible." *Id*. at 283-284.

Almost three decades later, in *United States v. Jones*, 565 U.S. 400 (2012), the Court held that the government's attachment of a GPS tracking device to the underside of a vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, was a search subject to Fourth Amendment protections. *Id*. at 404. The Court held that the attachment of the device constituted a physical trespass, which, combined with an attempt to gain information, may constitute a violation of the Fourth Amendment. *Id*. at 407-8. The Court declined to address the government's contention that Jones had no reasonable expectation of privacy in the outside of his vehicle, stating that "Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation." *Id*. at 406. *See also id*. at 409 ("the *Katz* reasonable-expectation-of-privacy test has been *added* to, not *substituted* for, the common-law trespassory test") (emphasis in original).

## C. Application of *Stone v. Powell*

Respondents argue that Mr. Campbell is not entitled to federal habeas review of his Fourth Amendment claim pursuant to the rule of *Stone v. Powell*, 428 U.S. 465 (1976). (Doc. 23 at 9).

In *Stone*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the

ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494. In limiting federal habeas review for Fourth Amendment violations, the Supreme Court reasoned that any additional contribution gained from consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the associated costs. *Id.* at 493-94.

The Supreme Court has not defined precisely the phrase "opportunity for full and fair litigation." *See Gamble v. State of Oklahoma*, 583 F.2d 1161, 1164 (10th Cir. 1978). In *Gamble*, the Tenth Circuit determined that the phrase:

> includes, but is not limited to, the procedural opportunity to raise or otherwise present a Fourth Amendment claim. It also includes the full and fair evidentiary hearing contemplated by *Townsend* [*v. Sain*, 372 U.S. 293 (1963)]. Furthermore, it contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards.

*Id.* at 1165. "Thus, a federal court is not precluded from considering Fourth Amendment claims in habeas corpus proceedings where the state court willfully refuses to apply the correct and controlling constitutional standards." *Id.*

Mr. Campbell asserts that his Fourth Amendment claim is not barred by *Stone* because the state courts rejected the claim for lack of standing and did not reach the merits. (Doc. 1 at 12). The court, however, reached an alternative holding on the merits. The trial court concluded that Mr. Campbell lacked standing to challenge the "search," the court also determined that he did not have a reasonable expectation of privacy in the location data obtained from his ankle monitor. On direct appeal, the Colorado Court of Appeals expressly applied the holdings of *Smith v. Maryland* and *United States v. Miller* in concluding that Mr. Campbell did not have a reasonable expectation of privacy in GPS data obtained

from his ankle monitor that was transmitted to a third party as a condition of his bond. The state appellate court distinguished *United States v. Jones* on its facts. The state courts thus addressed and rejected the arguments he seeks to make here.

Mr. Campbell next argues that he did not receive an opportunity for full and fair litigation of his Fourth Amendment claim in the state courts because the trial court did not allow him to develop "the factual circumstances relating to my bond and the ankle monitor—specifically whether the ankle monitor was imposed by the government as a condition of my bail, or whether it was based solely on a private agreement between me and my private bail bondsman." (Doc. 24 at 1). But this was not contested: a detective testified at the evidentiary hearing that Mr. Campbell was wearing the ankle monitor as a condition imposed by the bond surety, not the court (*See* R., 1/6/14 Hr. Tr. at 49), and defense counsel stated that this fact was "undisputed" (*id.*, 1/7/14 Hrg Tr. 28). Mr. Campbell was not denied a full and fair opportunity to be heard as to the reason he was wearing an ankle monitor.

Mr. Campbell also maintains that he did not receive a full and fair opportunity to litigate his Fourth Amendment claim in the state courts because the Colorado Supreme Court willfully refused to apply *Carpenter* to the merits of his claim when the Court denied his petition for certiorari review. (Doc. 24 at 4). This argument lacks merit.

An individual has no right under Colorado law to appeal a criminal conviction to the Colorado Supreme Court. Instead, "[t]he decision to grant writs of certiorari under [C.A.R. 49(a)] is entirely within this court's sound discretion, and is reserved for cases in which there are 'special and important reasons' supporting certiorari." *Bovard v. People*, 99 P.3d 585, 592-93 (2004) (en banc) (citing Colo. App. R. 49(a)). *See also People v. Valdez,* 789 P.2d 406, 408 (Colo. 1990) (recognizing that the Colorado Supreme Court "has absolute discretion to grant or to deny a

petition for writ of certiorari to review a final judgment of a lower tribunal."). Further, the denial of certiorari does not constitute a determination of issues on the merits. *Bovard*, 99 P.3d at 593 (citing *Menefee v. City and County of Denver*, 544 P.2d 382, 383 (Colo.1976)) ("Denial of a petition for certiorari review in a criminal case means nothing more than that this court has declared that the case is not properly postured for further appellate review"). *Accord Allison v. Industrial Claim Appeals Office of State of Colo.*, 884 P.2d 1113, 1118 (Colo. 1994) (citing *Maryland v. Baltimore Radio Show*, 338 U.S. 912, 917-20 (1950)) (holding that the denial of a petition for a writ of certiorari does not support the conclusion that either the majority or the dissent at the prior levels correctly applied the law). The Colorado Supreme Court's decision to deny certiorari review, without addressing the merits of Mr. Campbell's Fourth Amendment claim, cannot be deemed a willful refusal to apply the correct and controlling constitutional standards. *Gamble*, 583 F.2d at 1165.

The state trial and appellate courts provided Mr. Campbell with an opportunity for full and fair litigation of his Fourth Amendment claim. The state trial court held an evidentiary hearing on Mr. Campbell's motion to suppress the GPS data obtained from his ankle monitor. And the Colorado Court of Appeals affirmed the trial court's order denying the motion by applying the governing Fourth Amendment principles set forth in *Katz*, *Miller* and S*mith*, and distinguishing *Jones* on its facts. *See Smallwood v. Gibson*, 191 F.3d 1257, 1265 (10th Cir.1999) (holding that petitioner was not entitled to habeas review of Fourth Amendment claim where petitioner's trial counsel informed the trial court of the factual basis for a Fourth Amendment claim, appellate counsel presented the issue to the state appellate court on direct appeal, and the state courts "thoughtfully considered the facts underlying petitioner's Fourth

Amendment claim" but rejected it on the merits by applying appropriate Supreme Court precedent).

The Supreme Court "has not held that *Carpenter* is retroactively applicable to cases on collateral review, nor does any combination of cases necessarily dictate its retroactivity." *In re Symonette*, No. 19-12232, 2019 U.S. App. LEXIS 20428, *4 (9th Cir. 2019). Accordingly, the state trial and appellate courts reviewed Mr. Campbell's claims under the correct constitutional standard.

Mr. Campbell's argument that the state courts reached the wrong conclusion is not pertinent to the Court's inquiry under *Stone*. *See Matthews v. Workman*, 577 F.3d 1175, 1194 (10th Cir. 2009) ("Mr. Matthews argues that Oklahoma misapplied Fourth Amendment doctrine in reaching these conclusions, but that is not the question before us. The question is whether he had a full and fair opportunity to present his Fourth Amendment claims in state court; he undoubtedly did."); *Cannon v. Gibson*, 259 F.3d 1253, 1264 (10th Cir. 2001) (dismissing habeas petition based on a Fourth Amendment claim because the challenge was "more akin to an attack on the merits of the [prior state court] decision rather than a charge that [it] willfully misapplied constitutional law"); *Stevenson v. Timme*, No. 13-1147, 536 F. App'x 789, 790-91 (10th Cir. Aug. 27, 2013) (unpublished) (petitioner's "disagreement with the precedent applied and the conclusions reached by the state courts does not demonstrate an 'unconscionable' breakdown in the state court proceedings.") (quoting *Gamble*, 583 F.3d at 1165 n. 3).

The Court finds and concludes that, pursuant to the rule of *Stone v. Powell*, Mr. Campbell is not entitled to federal habeas review of his Fourth Amendment claim.

### D. Analysis under AEDPA

Mr. Campbell argues that the Colorado Court of Appeals' decision was contrary to, or an unreasonable application of, the Fourth Amendment legal principles relied on by the Supreme Court to support its holding in *United States v. Carpenter*. (Doc. 1 at 8-12). But the Supreme Court has not found *Carpenter* to be retroactive, nor has a combination of Supreme Court cases made it so. *In re Symonette* at*4. *Carpenter* was decided on June 22, 2018, five months after the Colorado Court of Appeals issued its decision affirming Mr. Campbell's convictions. Therefore, *Carpenter* is not controlling Supreme Court law for purposes of applying § 2254(d)(1) to Mr. Campbell's Fourth Amendment claim.

### b. Claim Two: Due Process

Mr. Campbell's second claim contends that his Fourteenth Amendment due process rights were violated when the trial court admitted evidence from an unduly suggestive pre-trial police identification procedure. (Doc. 1 at 12-16). He further contends that the victim's in-court identification of him also violated due process. (*Id.* at 16).

#### 1. State court proceedings

The trial court held an evidentiary hearing on Mr. Campbell's motion to suppress the victim's out-of-court identification of him. The victim testified that he awoke to noise downstairs in his home, opened his bedroom door, and saw a male intruder on the staircase approximately ten feet away from him. (R., 1/2/14 Hrg. Tr. (James Pettigrew testimony) at 18-21). The victim was "startled" by the presence of the intruder, looked at the intruder for one or two seconds before the intruder swore, turned, and ran away. (*Id.* at 21-22). The victim testified that he did not "get a good look at" the intruder's face because the intruder had the hood of his sweatshirt over his head, but he described the man as an African-American, 5'8" or 5'9" tall, of medium build, and wearing dark jeans, a gray or black zip-up hooded sweatshirt, and white sneakers. (*Id.* at 22-24).

The victim indicated that the incident occurred around 10 a.m., the lighting in the house was good and that he was paying attention to the stranger in his home. (*Id*. at 46-48). The victim is nearsighted and was not wearing his corrective lenses when he saw the intruder, but later explained that his vision is "not bad" and he could see the intruder. (*Id*. at 29, 44-45).

As the intruder left the victim's house, the victim pursued him outside and watched him drive away in a white Ford Explorer. (*Id*. at 27-28). The victim called 911 and a police officer responded within minutes. (*Id*. at 25). The 911 operator told the victim that the police had stopped a white Ford Explorer matching the description he provided. (*Id*. at 34). The responding police officer took the victim to the location where the vehicle was stopped. (*Id*. at 35, 39). When the victim arrived, there were eight to ten police officers, four or five police vehicles, and two police motorcycles present. (*Id*. at 37-38). There were no civilians, except for the Mr. Campbell who was sitting in the back of a police car. (*Id*. at 39). When Mr. Campbell was taken out of the police car, the victim "knew almost immediately" he was the intruder. (*Id*. at 39-40, 42). The officer cautioned him to "slow down, make sure" and had other officers turn Mr. Campbell around. (*Id*. at 42). The victim testified that he was "about 95 percent certain" of his identification. (*Id*. at 45-46). The victim stated that he was wearing his glasses when he identified the Mr. Campbell and that Mr. Campbell was wearing the same clothes he had on when inside the victim's house. (*Id*. at 42, 44-45, 47). The victim did not recall whether Mr. Campbell was handcuffed. (*Id*. at 40).

The police officer who stopped Mr. Campbell testified that the victim arrived to identify the driver approximately 15-20 minutes after the stop. (R. 1/6/14 Hrg. Tr. (Officer David Schmidt testimony) at 15-17). The officer instructed Mr. Campbell, who was in handcuffs, to come to

the front of the patrol car so the witness could view him from approximately 50 feet away. (*Id.* at 25, 36-38). Four or five law enforcement vehicles were present. (*Id.* at 35). There were no other civilians present and Mr. Campbell was the only African-American man at the scene. (*Id.* at 37-38). The officer testified that Mr. Campbell was wearing a hooded sweatshirt with black and white horizontal lines, black pants, a black t-shirt, and black tennis shoes. (*Id.* at 34).

The officer who responded to the victim's 911 call testified that the victim stated he "locked eyes with a male that was halfway up the stairs" as he exited his bedroom. (R., 1/6/14 Hrg. Tr. (Officer Angelo Capolungo testimony) at 79). The victim described the intruder as an African-American man with a medium build, and a medium-colored complexion, wearing a gray hoodie and jeans. (*Id.* at 78-80). The officer further testified that the victim was "visibly shaken" and his "voice was excited" during their conversation. (*Id.* at 80). After being informed about the traffic stop of the suspected intruder, the officer asked the victim to go with him to the scene of the stop. (*Id.* at 81). The victim observed Mr. Campbell from a distance of approximately 30 feet and stated that he was "positive" Mr. Campbell was the person he had confronted in his home. (*Id.* at 82-83). The victim also recognized the white Ford Explorer as the one he had seen drive away from his home. (*Id.* at 84). The officer stated that he responded to the burglary scene within two minutes of the dispatch call, that he was at the victim's home for 15 or 20 minutes before taking him to identify the suspect, and that the drive to the location where Mr. Campbell was stopped took approximately 10 minutes. (*Id.* at 82, 88).

At the conclusion of the suppression hearing, the trial court found that although the one-on-one show up procedure was suggestive, *id.* at 122, the identification was nonetheless reliable:

> And in determining the reliability of the identification the Court must balance the corrupting effect of the suggestive

identification against the following factors: The witness's opportunity to view the perpetrator at the time of the crime.

And the Court finds that Mr. Pettigrew said he didn't get a good look at the person's face. And that was in response to a question about whether he had facial hair.

He did give a very detailed description of not only suspect, but also of suspect's vehicle. He indicated they came face-to-face about 10 feet away for about one to two seconds. The witnesses's degree of attention. I think they were both startled, but the Court finds that would lead to heightened attention.

The accuracy of the witness's prior description of the perpetrator. And the Court finds that was highly accurate. The level of certainty demonstrated by the witness of the confrontation. And again, Mr. Pettigrew knew almost immediately. The officer had to tell him to slow down. And he indicated he was 95 percent certain.

The length of time between the crime and the confrontation. And, actually, I went back and played the end of the 911 call a couple times to get the exact length of that DVD. It's 7 minutes and 50 seconds. So by the end of that recording, the 911 tape, a person was pulled over.

And as the defense indicated, it's reasonable to assume that was Mr. Campbell's vehicle that was pulled over. So he was pulled over within a very short period of time.

. . .

So the Court does find that although there is some suggestibility here, based on the totality of the circumstances the Court does find that the identification here was reliable under the totality of the circumstances given the one-on-one showup.

Therefore the motion to suppress the in-court identification will be denied.

(*Id.* at 123-125).

Mr. Campbell appealed the trial court's ruling denying his motion to suppress the victim's identification. The Colorado Court of Appeals rejected Mr. Campbell's claim by applying the two-step analysis from *Bernal v. People*, 44 P.3d 184 (Colo. 2002). To determine admissibility, "a court must determine whether the photo array way impermissibly suggestive, which the defendant has the burden of proving." *Id.* (internal citations omitted). If the defendant meets this burden, the burden shifts to the government "to show that despite the improper suggestiveness, the identification was nevertheless reliable under 'the totality of the circumstances.'" *Id.* at 191 (internal citations omitted).

At the second step, a court uses five factors to determine whether the identification was reliable despite a suggestive array:

1.   the opportunity of the witness to view the criminal at the time of the crime;

2.   the witness's degree of attention;

3.   the accuracy of the witness's prior description of the criminal;

4.   the level of certainty demonstrated by the witness at the confrontation; and

5.   the length of time between the crime and the confrontation.

*Id.* at 192. The suggestiveness of these factors must be balanced "against indicia of reliability surrounding the identification to determine whether the identification should be suppressed" provided that there is not a "very substantial likelihood of irreparable misidentification." *Id.*; *see also People v. Weller*, 679 P.2d 1077, 1083 (Colo. 1984).

D. Analysis
The trial court found, Campbell argues, and the People do not contest that the show-up procedure utilized here was impermissibly suggestive. We agree. When the victim arrived at the scene of Campbell's arrest, Campbell was

handcuffed in the back of a police vehicle surrounded by officers and he was the only black person present. Moreover, the dispatcher told the victim that officers had pulled over a vehicle matching his description. This show-up procedure was impermissibly suggestive. *See generally Weller*, 679 P.2d at 1083 ("One-on-one showups are not favored and tend to be suggestive.").

Nevertheless, we conclude that the People met their burden of proving that the identification was reliable despite the suggestive procedure. With regard to the first factor set forth in *Bernal*, the victim had the opportunity to see the intruder for one or two seconds in a well-lit area while the two men were about ten feet away from one another. Moreover, the victim testified that, although he was not wearing contact lenses or eyeglasses, he felt he was able to see the intruder sufficiently to later identify him. As for the second factor, the trial court concluded that the victim was startled when he encountered the intruder, which heightened his degree of attention, and we defer to this finding.

The third factor—the accuracy of the witness' description— weighs less in favor of the People. The victim's description of the intruder was somewhat generic, and there were inconsistencies between the description provided to the 911 dispatcher and Campbell's actual appearance. However, looking to the fourth factor, the victim's confidence in the identification was high. He quickly confirmed that Campbell was the intruder once on the scene, and he later testified that he was ninety-five percent sure his identification was accurate. He was also "very positive" on the color, make, and model of the car that he saw driving away from his home. Finally, the time between the crime and confrontation was extremely brief. The identification occurred less than an hour after the victim first saw the intruder.

In sum, especially in light of the strength of the final two factors, we conclude that the identification was reliable despite the suggestiveness of the procedure. We cannot say that, given the totality of the circumstances, there was a "very substantial likelihood of irreparable misidentification." *Bernal*, 44 P.3d at 192. As a result, we conclude the trial court did not err in denying the motion to suppress the identification.

*Campbell*, 425 P.3d at 18-74, 46-48.

### E. Applicable Supreme Court law

"[T]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). A challenge to the constitutionality of a pre-trial identification procedure requires a two-step analysis. First, the court determines whether the identification procedure was impermissibly suggestive. *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Manson*, 432 at 113-14. Second, if the identification was impermissibly suggestive, the court must further determine whether, under the totality of the circumstances, the suggestive procedure created a "substantial likelihood of misidentification" or was reliable. *Biggers*, 409 U.S. at 201. "[R]eliability is the linchpin in determining the admissibility of identification testimony. *Manson,* 432 U.S. at 114. A court must weigh five factors when evaluating the reliability of a police identification procedure:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witnesses' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200; *Manson*, 432 U.S. at 114, 117.

If there is a "very substantial likelihood of irreparable misidentification . . . the judge must disallow presentation of the evidence at trial." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). "But if the indicia of

reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will determine its worth." *Id*.

### 3. Analysis under AEDPA

The Colorado Court of Appeals applied a state law multi-factor analysis identical to the analysis set forth in *Neil v. Biggers* in concluding that the out-of-court identification, although impermissibly suggestive, was nonetheless reliable, and was properly admitted at trial. Accordingly, the legal principles applied by the state appellate court were not contrary to Supreme Court law.

In determining whether the Colorado Court of Appeals' decision was an unreasonable application of Supreme Court law, the court defers to the factual findings underlying the state appellate court's determination of reliability. *See Sumner v. Mata*, 455 U.S. 591, 597-98 (1982); *Stamps v. Miller*, No. 18-1393, 763 F. App'x 686, 696-97 (10th Cir. Feb. 12, 2019) (unpublished) ("Because reliability is a factual issue, we presume the state court's determination to be correct, and Mr. Stamps can only overcome this presumption by a showing of "clear and convincing evidence." 28 U.S.C. § 2254(e)(1)."). However, the determination of whether Mr. Campbell's due process rights were violated by an unconstitutional pretrial identification procedure is a mixed question of law and fact. *United States v. Worku*, 800 F.3d 1195, 1205 (10th Cir. 2015); *Archuleta v. Kerby*, 864 F.2d 709, 710-11 (10th Cir. 1989).

The Court is mindful that the *Biggers* fact-based inquiry is a general standard. The Supreme Court has cautioned that "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Harrington*, 562 U.S. at 101; *see also Brisco v. Ercole*, 565 F.3d 80, 89-90 (2d Cir. 2009) (stating that the unreasonable application standard is especially deferential where state

courts apply open-ended, multifactor tests like that in *Biggers*); *Williams v. Bauman*, 759 F.3d 630, 639 (7th Cir. 2014) (same); *accord Taylor v. Roper*, 561 F.3d 859, 863 (8th Cir. 2009) (recognizing that where the governing legal standard in a § 2254 proceeding is "a general, multifactor standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard") (internal quotation marks and citation omitted).

The Colorado Court of Appeals found that the first *Biggers* factor weighed in favor of a finding of reliability because the victim had the opportunity to see the intruder for one or two seconds in a well-lit area while the two men stood about ten feet away from one another. Mr. Campbell contends that this factual finding was unreasonable because the victim testified at the suppression hearing that he was not wearing his corrective lenses when he saw the intruder in his house and he "didn't get a good look at" the intruder's face. (*See* Reply at 13, citing R., 1/2/14 Hrg. Tr. at 23; Application at 13). However, the victim also testified that his uncorrected vision was "not bad" and that he could see the intruder. (R., 1/2/14 Hrg. Tr. at 44-45). Further, the police officer who responded to the victim's house testified that, according to the victim, who was very excited, he and Mr. Campbell made eye contact. (*Id.*, 1/6/14 Hrg. Tr. at 79).

The Court finds that the state appellate court's finding on the first *Biggers* factor—that the victim had sufficient opportunity to view the intruder—was reasonable in light of the evidence at the suppression hearing that the victim saw Mr. Campbell at close range, in a well-lit area, and was paying attention to him, even if it was for only 1-2 seconds. (R., 1/2/14 Hrg. Tr. at 21-22, 46-48).

Under the second *Biggers* factor, the Colorado Court of Appeals deferred to the trial court's factual finding that the victim was startled when he encountered the intruder, which heightened the victim's degree

of attention. Mr. Campbell argues that this factual finding was unreasonable because the state appellate court ignored the victim's testimony that he had just woken up from sleeping. (Doc. 1 at 13; No. 24 at 14). But the fact that the victim had just woken up, without more, does not mean that he was not able to pay attention to an intruder in his home, especially given the victim's testimony that he was "startled" by the intruder's presence on his staircase. (*See* R., 1/2/14 Hrg. Tr. at 21-22). The Court finds that the state appellate court's finding on the second *Biggers* factor—that the victim was sufficiently paying attention to the intruder—was reasonable in light of the evidence presented in the state court proceeding. Mr. Campbell has not pointed to any clear and convincing evidence to rebut the state court's factual finding.

With regard to the third *Biggers* factor—the accuracy of the victim's description of the intruder—the Colorado Court of Appeals concluded that this factor weighed "less in favor of the People." However, the state appellate court determined, based on the strength of the fourth and fifth factors, that the identification was nonetheless reliable.

Mr. Campbell argues that the state appellate court's reliability determination ignored the fact that the third factor weighed heavily in his favor. (Doc. 24 at 15; *see also* Doc. 1 at 16). According to Mr. Campbell, the discrepancies in the victim's description and Mr. Campbell's actual appearance were not minor and the victim's description "couldn't have been further from how I looked unless I was dressed as a woman." (*Id.*).

Mr. Campbell described the intruder to the 911 operator as an African-American male of medium build who was wearing a gray hoodie, dark jeans and white sneakers. (R. 1/2/14 Hr. Tr. at 22-24). An officer testified that when he stopped Mr. Campbell's vehicle, he was wearing a hoodie with gray and white horizontal stripes, a black t-shirt, black tennis shoes and black pants. (R. 1/6/14 Hrg. Tr. at 34). In addition, there were some discrepancies between the victim's description of the

intruder's hair to the 911 operator and the actual length of Mr. Campbell's hair. (R. 1/14/14 Trial Tr. at 216-218).

The Colorado Court of Appeals' findings that the fourth and fifth *Biggers* factors—the level of certainty demonstrated by the victim at the confrontation and the length of time between the crime and the confrontation—weighed in favor of the reliability of the identification are supported by the testimony at the suppression hearing and Mr. Campbell does not contend otherwise.

The Court finds that the discrepancies between the victim's description of Mr. Campbell's physical appearance and his actual appearance do not compel a conclusion that the Colorado Court of Appeals' determination of reliability was unreasonable. Because reliability is assessed in light of the "totality of the circumstances," *Biggers,* 409 U.S. at 199, no single factor standing alone is dispositive. Given the broad leeway afforded the state courts in applying the *Biggers* factors, the Court concludes that the Colorado Court of Appeals reasonably applied *Biggers* and *Manson* in determining that the police identification procedure did not result in a substantial likelihood of irreparable misidentification. Further, because the Colorado Court of Appeals reasonably decided that the victim's out-of-court identification was admissible at trial, it was reasonable for the state appellate court to further conclude that the victim's in-court identification of Mr. Campbell was also admissible. *See Romero v. Tansy*, 46 F.3d 1024, 1032 (10th Cir. 1995).

Mr. Campbell is not entitled to federal habeas relief for his second claim.

## CONCLUSION

It is **ORDERED** that Mr. Campbell's Application for a Writ of Habeas Corpus Pursuant (Doc. 1), is **DENIED** and this action is **DISMISSED WITH PREJUDICE**.

It is **FURTHER ORDERED** that no certificate of appealability shall issue because Mr. Campbell has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Fed. R. Governing Section 2254 Cases 11(a); *Slack v. McDaniel*, 529 U.S. 473, 483-85 (2000).

DATED November 4, 2020          BY THE COURT:

DANIEL D. DOMENICO
United States District Judges